1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PACIFIC MARINE CENTER, INC.,              No.  1:13-cv-00992-DAD-SKO

12                  Plaintiff,

13        v.                                   FINDINGS OF FACT AND CONCLUSIONS
                                               OF LAW
14   PHILADELPHIA INDEMNITY
     INSURANCE COMPANY,
15
                 Defendant.
16

17          This matter concerns a dispute over an insurance contract.  A court trial was held

18   commencing on October 18, 2016 and concluding on October 27, 2016.  For the reasons

19   explained below, the court finds plaintiff has not met its burden of proof and therefore finds in

20   favor of defendant and will direct that judgment be entered for defendant.

21                           PROCEDURAL BACKGROUND

22          This action was initially filed by both Pacific Marine Center, Inc.[1] and its apparent

23   principal—Sona Vartanian—in her individual capacity, in Madera County Superior Court in May

24   _____

25   [1]  Plaintiff has attempted to suggest a need to differentiate between Pacific Marine Center, Inc.
     and Pacific Marine Center, the "doing business as" designation of another related company,
26   Pacific Sales and Leasing.  This distinction is largely irrelevant for purposes of deciding this case.
     The evidence presented at trial suggests this dispute focuses on one business, which may have
27   had various corporate forms at various times, but functioned as a single entity.  Since neither
     party has demonstrated a need to distinguish between "Pacific Marine Center, Inc." and "Pacific
28   Marine Center," the court will do so below only when necessary.

                                        1

1  2013, and removed here on diversity grounds by defendant Philadelphia Indemnity Insurance

2  Company ("PIIC") in June 2013.  (Doc. No. 1.)  Cross motions for summary judgment were filed

3  in January 2016.  (Doc. Nos. 76, 84.)  The court denied those motions by order dated March 18,

4  2016, with the exception that the court dismissed Sona Vartanian as a plaintiff in her individual

5  capacity.  (Doc. No. 134.)  As noted, a bench trial was conducted in October 2016.  Following

6  trial, the court directed the parties to submit proposed findings of fact and conclusions of law,

7  which the parties separately filed on November 10, 2016.  (Doc. Nos. 195, 196.)

8        Pursuant to Federal Rule of Civil Procedure 52, the court now finds the following facts

9  and separately states its conclusions of law.  Fed. R. Civ. P. 52(a)(1).

10                                **FINDINGS OF FACT**

11        The evidence presented to this court at the bench trial consisted of eleven witnesses and

12  ninety-one exhibits.  The court also considered as evidence certain selections of a deposition

13  transcript from Zane Averbach, Esq., a former attorney for Sona Vartanian, who was deemed

14  unavailable to testify at trial.  Mr. Averbach's deposition testimony was read into the record at

15  trial.  The trial witnesses who were sworn and testified included Sona Vartanian, Howard

16  Gastwirth, Ronald Miller, Thomas Leith, Elaine Barajas, Hagop Vartanian, attorney Thomas

17  Nast, James Stanley Deakin, Barry Cohen, Robert R. Hastey, and James Schratz.  Thirty-three

18  joint exhibits were submitted and all were admitted in their entirety.  Additionally, fifty-eight

19  exhibits, either in whole or in part, from the separate exhibit lists of defendant and plaintiff were

20  admitted into evidence.  All of this evidence has been considered in the court's decision, as have

21  the parties' trial briefs and other submissions and arguments.  The court now finds the following

22  facts.

23        Hagop Vartanian[2] started a business selling boats and boating accessories on Highway 41

24  in Madera, California in 1996.  The business—Pacific Sales and Leasing, doing business as

25  Pacific Marine Center—was predominantly run by Hagop, with occasional help from his sister

26  /////

27  _____

28  [2]  Hagop Vartanian is also known as "Jack," but has been referred to as Hagop in the court's prior
    orders, and will be similarly referred to here.

1    Sona[3] starting in 2002.  A related corporation known as Pacific Marine Center, Inc. was also

2    founded by Hagop during this period.  This corporation, the plaintiff in the present case, lay

3    dormant for a number of years until it was reactivated by Hagop's lawyer, Tom Nast.

4            In 2001 Hagop was indicted on federal criminal charges for subscribing to false tax

5    returns and making false statements on loan applications in violation of 26 U.S.C. § 7206 and 18

6    U.S.C. § 1014.  In March 2003, following a jury trial, Hagop Vartanian was convicted on all

7    counts.  He was sentenced in July 2005 to a fifteen-month term of imprisonment but remained

8    free on bail pending appeal.  On May 25, 2007, Hagop's judgment of conviction was affirmed by

9    the Ninth Circuit Court of Appeals leading to the setting of November 15, 2007 as the date by

10   which he would be required to surrender himself to the custody of the U.S. Bureau of Prisons.

11   Once the Vartanian family learned Hagop's convictions had been upheld on appeal and he would

12   be incarcerated, the family took steps at the direction of attorney Nast to ensure Hagop's business

13   would survive his incarceration.  Attorney Nast was particularly concerned the IRS would seek to

14   levy on the business in order to satisfy Hagop's tax debts, and constructed an intra-family

15   transaction to attempt to prevent that from taking place.  The plan called for the activation of the

16   formally dormant Pacific Marine Center, Inc., which would enter into an asset purchase with

17   Hagop for his complete boat inventory at fair market value.  Those assets would be purchased by

18   a promissory note with an extended, thirty-year payment schedule, preferably executed at a

19   moment when the boat inventory was fairly low, which would help to keep the monthly payments

20   under the promissory note to a minimum.  (*See, e.g.*, Parties' Joint Ex. JX-5.)  Under this plan,

21   Hagop would resign any position within the corporation, which would convert to a closed

22   corporation, and would sell his stock to a family member for a nominal amount of $500.

23   Following his release from imprisonment, the stock could later be repurchased by Hagop from the

24   trusted family member for the same nominal payment**,** while the assets would be left within the

25   corporation.

26   /////

27

28
_____
[3]  Because multiple people involved in this dispute have the last name Vartanian, both Hagop and his sister Sona will be referred to by their first names.

1     This plan had multiple potential benefits for the Vartanian family.[4]  Hagop could maintain

2   his business throughout his incarceration by putting it under the care of one of his family

3   members.  In the event the IRS decided to attempt to levy on Hagop's property, the only business-

4   related asset available to be levied on would be the promissory note.  The extended payment

5   scheme and the low monthly payments would leave the note a clearly undesirable target to levy

6   on for the IRS.  Further, even in the event the IRS did levy on the note, the payments would be

7   minimal, which would allow the business to continue to function despite any additional monthly

8   payments required.  Once Hagop repurchased the stock from the family member at some point

9   after the threat of an IRS levy had passed, he would again be in control of his business, having

10   lost only a moderate per-month payment to the IRS in the event it levied on his property (i.e., the

11   promissory note).

12     Many, if not all, of the Vartanian family members were present for multiple discussions

13   regarding the execution of this plan.  At least Sona and Hagop, as well as their brother Kirk

14   Vartanian, were present at these meetings, and Sona's son Marty may also have been present.  It

15   is unclear whether Sona and Hagop's parents, who apparently lived in the family home with

16   Hagop, were present for any of these meetings.  Attorney Nast was certainly present at them and

17   once he had laid out the plan for the family's consideration, the family collectively discussed who

18   would be the best caretaker for the business.  Kirk was rejected for this role because he had

19   financial and legal troubles of his own, and Marty was eliminated because he was too young and

20   inexperienced to serve as principal.  Sona therefore presented the only logical choice, and the

21   family agreed she should purchase the corporation's stock and serve as a caretaker for the

22   business while Hagop was in prison.

23

---

24   [4]  It would appear fair to characterize this plan as a scheme.  The court expresses no opinion about
whether this scheme or any of its component parts might have constituted a fraudulent
25   conveyance, as that matter is not before the court at this time.  *See Mejia v. Reed*, 31 Cal. 4th 657,
664–66 (2003) (noting California's version of the Uniform Fraudulent Transfer Act renders a
26   conveyance fraudulent as to both present and future debtors if it is done "[w]ith actual intent to
hinder, delay, or defraud any creditor of the debtor") (quoting Cal. Civ. Code § 3439.04(a)).
27   Nothing said here should be taken, however, to suggest that this court approves of this
arrangement.
28

Attorney Nast explained to the family that there could be no enforceable agreement, written or oral, that Sona would sell the stock back to Hagop after he was released from his imprisonment.  Nast was concerned that, if such an agreement were formulated, the family members might be required to either reveal that the transfer was fraudulent or lie under oath when questioned by IRS agents.  Therefore, attorney Nast advised there simply had to be a "family understanding" that the corporation's stock would be returned to Hagop once he was released from prison and the threat of the IRS levying on the property had cleared.  According to attorney Nast's testimony, which the court found to be quite credible, both Sona and Hagop understood the nature of this "family understanding," and there was never any doubt among the family members that the business would revert to Hagop after he was released from prison and was clear of the threat of an IRS levy.

Shortly before reporting to prison in November 2007, Hagop executed a power of attorney in favor of his sister Sona, again at the direction of attorney Nast, which would allow Sona to finalize the transactions and set in motion the asset protection scheme.  (Parties' Joint Ex. JX-3.) The final purchase agreement between Pacific Marine Center and Hagop was entered into in June 2008, with Sona signing both on behalf of the corporation as its president and for Hagop via his power of attorney.  Also using the power of attorney, Sona executed several other documents, including a promissory note reconciling a variety of undocumented loans she had supposedly made to Hagop in years past.  This new promissory note, executed in June 2008, indebted Hagop to Sona for more than $270,000, and was secured by the promissory note by which Pacific Marine Center purchased the assets of the business from Hagop.  Thus, were Hagop to fail to pay Sona under this June 2008 note executed by Sona as to both parties to the transaction, he would forfeit any payment for the business assets of Pacific Marine Center.  It is unclear how Hagop purportedly incurred the debt reflected in this note:  Sona testified at trial that the debt reflected prior loans she had made to Hagop, while an e-mail entered into evidence suggested that some of

/////

/////

/////

5

1   the debt constituted loans Sona had made to Pacific Marine Center.  (*See* Parties' Joint Ex. JX-

2   10.)[5]

3          Hagop was released from prison sometime in late 2008 or early 2009, and then promptly

4   detained pursuant to an immigration hold while awaiting a deportation hearing.  At the

5   deportation hearing, Sona testified that if her brother was allowed to remain in this country she

6   would give him a job at Pacific Marine Center.  Sona testified before the immigration court that

7   Hagop would be running the business if he was allowed to stay in the United States, and that his

8   involvement was necessary to keep the business afloat.  Based at least in part on this testimony,

9   Hagop was not ordered deported and he returned to Pacific Marine Center in May 2009.  Over the

10   succeeding months, Sona helped Hagop fill out probation reports, which depicted him working as

11   a general adviser in boat sales at Pacific Marine Center and Pacific Sales and Leasing.[6]  Hagop

12   helped run the business during this time, selling boats, buying boats at auction for Pacific Marine

13   Center, and managing the business.

14          Though Hagop testified he did not draw a salary from Pacific Marine Center and was not

15   directly compensated for his work there, following his release from prison, accounting records

16   supplied introduced into evidence by plaintiff at trial show Pacific Marine Center making

17   hundreds of payments to Hagop between July 2008 and July 2010.  The payments were

18   frequently made multiple times per month, at irregular intervals and for irregular amounts.  (Exh.

19   _____

20   [5]  Notably, the fact that Sona believed loans made by her to Pacific Marine Center should be
    repaid by Hagop comports with the "family understanding" that the business belonged to Hagop
21   and would eventually be returned to him some time following his release from prison.

22   [6]  In her trial testimony, Sona explained she only put down Pacific Marine Center in the
    "employment" section of the United States Probation Office reports in order to reflect any
23   possible address Hagop could be at during normal business hours, not to reflect that he was
    actually employed there.  Indeed, at trial, Sona maintained that Hagop was never employed at
24   Pacific Marine Center.  Hagop too testified that he was not an "employee" of Pacific Marine
    Center, though this appears to be based on his belief that he was always the owner of the
25   business.  The court finds Sona's attempts to explain away the reports she completed and
    submitted to the United States Probation Office to be totally devoid of credibility.  As discussed
26   further below, it is clear Hagop worked at Pacific Marine Center following his release from
27   custody, regardless of whether he is more appropriately described as "employee," "authorized
    representative," or "proprietor."
28

6

1   P-1.)  The smallest individual payment was for $80, while the largest was for $45,000.  (*Id.*)

2   Sometimes the payments were made in cash, while most of the payments were made by check.

3   (*Id.*)  The payments were frequently in whole dollar amounts, though not always.  (*Id.*)  Most

4   surprisingly, multiple payments were frequently made on the same day, such as payments for

5   $3,800, $600, and $700, all of which were made separately to Hagop on April 8, 2010.  (*Id.*)  The

6   court finds Sona's explanation for the irregularity of these payments not to be credible.[7]  Though

7   no evidence was presented directly on this point, the most reasonable inference the court can

8   draw from the evidence presented at trial—and the one it does draw—is that these payments

9   reflect the sale of boats, boating accessories, or other goods and services by Pacific Marine

10   Center.  Thus, it appears the business paid much of its profits to Hagop on an ongoing basis

11   throughout Sona's guardianship.  This also happens to be the manner one might expect a closed

12   corporation to pay the owner and proprietor of that corporation.

13          In August 2009, shortly after Hagop's return to the business, the California Department of

14   Motor Vehicles (DMV) executed search warrants at Pacific Marine Center as well as at one of

15   Kirk Vartanian's businesses.  At trial, Sona identified this event as the beginning of the downfall

16   of her relationship with her brother Hagop.  Nevertheless, there was little evidence presented at

17   trial of any change in the siblings' relationship until almost a year later.

18          In July 2010, and possibly for some months preceding, the relationship between Hagop

19   and Sona soured.  Among other issues, the two disputed Hagop's purchase of certain boats at

20   auction on behalf of Pacific Marine Center, Hagop's hiring of certain employees, Sona's

21   ────────────────

22   [7]  Sona testified at trial that these were all payments by Pacific Marine Center under the original asset purchase scheme, which obligated the business to pay approximately $7,000 a month to Hagop.  These payment records reflect that Hagop was paid many times that amount per month; receiving $30,000 in November 2008, $72,480 in July 2009, and $37,155 in February 2010, for example.  (*See* Plaintiff's Ex. P-1.)  Sona testified that there were a number of reasons motivating the payments to be made to Hagop in this disjointed manner:  first, she did not trust Hagop and wanted to pay him off as soon as possible so she could be free of him; second, she felt obligated to pay him as quickly as possible because he was her family; third, Hagop had many bills and whenever he had a bill due he would simply come to her and she would give him money in the needed amount which she chose to consider as payments on the loan; and fourth, there was simply nothing in the asset purchase agreement that said she could not pay him in this disjointed manner.  The court simply does not find any of these shifting explanations provided by Sona for the manner in which the payments were made to be credible.

purported failure to pay bills of the business that were coming due, complaints from customers about Sona's handling of the business, and the decreasing amount of boat inventory that was being kept on-hand by the business.  At some point during this month, Sona hired an accountant to advise her how much would be outstanding on the asset purchase agreement, if all the payments that had been made to Hagop were counted as payments made under that agreement. She then contacted an attorney, Zane Averbach, who gave her a notice to post at the business advising those working there that Hagop did not work or consult for Pacific Marine Center.[8] Attorney Averbach subsequently contacted both Hagop and attorney Nast on Sona's behalf to tell Hagop to stay away from Pacific Marine Center.  Hagop responded by revoking the power of attorney by which he had authorized Sona to act on his behalf while he was incarcerated.

The dispute between the sister and brother came to a head on July 24, 2010.  According to Sona's testimony at trial, Hagop physically assaulted her and threatened her that day and drove her out of the business, changing the locks and stealing all of Pacific Marine Center's boats. Hagop testified that the two did argue, with Sona eventually telling him to stay away from Pacific Marine Center before she left.  Hagop maintained he did not assault his sister.  Further, Hagop testified he did not change the locks on the building.  According to Hagop, Sona did not return to the business for several days after this argument, at which point the landlord came to the business

---

[8]  Specifically, the notice dated July 22, 2010, signed and posted by Sona at Pacific Marine Center was entitled "ALERT/CAUTION," directed to "Any Person Hired By Or Working For Hagop (Jack ) Vartanian ("Jack")/To Whom This May Concern" and read as follows:

> It has come to my attention that Jack, who is my brother, has been telling people that he works or consults for the Company and/or has hired people who may believe that they have been hired by or are working for the Company.
>
> **Please be advised that Jack does <u>not</u> work or consult for the Company and that anyone hired by or working for him does not work for the Company.  Further, if you take instruction from Jack without confirming any instruction with me you can not work for the Company**
>
> Please conduct yourself accordingly.

(Parties' Joint Ex. JX-16) (emphasis in original).

asking Hagop about unpaid rent.[9]  Hagop testified that because he had not seen Sona and was worried about the landlord also seizing the boat inventory if he took back the property for failure to pay rent, Hagop moved the boats next door to his property at 10452 Highway 41.  Further, according to Hagop, he believed the boats to be his property in any event based upon his the "family understanding" that had been reached.  Under that agreement, Pacific Marine Center had always remained his business and his sister Sona had just been taking care of it while he was in prison.  Hagop testified it was his understanding that because his money purchased the boats, they were ultimately his, and that was why he took them.

Hagop took a number of steps consistent with his professed understanding that he was the rightful owner of the boats.  Shortly after taking the boats and moving them to his property, Hagop sent Sona a letter indicating he had repossessed the boats, providing her with an inventory of the items he had repossessed.  Additionally, in August 2010, Hagop called Elaine Barajas, the insurance broker who had sold the insurance policy to Pacific Marine Center, to discuss an insurance bill.  During the call, he advised Ms. Barajas he had taken over the business.  This prompted Barajas to reach out to Sona to confirm whether Hagop was the appropriate contact for Pacific Marine Center.  Barajas was told by Sona that there was a legal dispute between her and her brother, Hagop about who owned the business.  Sona also instructed Barajas to reduce the coverage on the insurance policy by eliminating Hagop's building at 10452 Highway 41 from the coverage and lowering the overall policy limits.  Hagop meanwhile had contacted the DMV directly as well, seeking to have titles re-issued for any boats he had taken possession of for which Sona had retained possession of the titles.  It appears from the evidence admitted at trial that at least some of those titles were reissued by the DMV at Hagop's request.

/////

---

[9]  Pacific Marine Center was originally located at 10452 Highway 41, a building owned by Hagop.  During Hagop's incarceration, the business expanded to include the neighboring property at 10432 Highway 41.  This property was owned by Ron Miller, and leased originally by Kirk Vartanian, before the lease was transferred to Sona.  Pacific Marine Center was thereafter run from both locations, with offices and various components of the business being conducted at both of the adjoining addresses.  The insurance policy in question here initially covered both addresses.

1    During the successive months, Sona and Hagop entered into mediation to attempt to

2  resolve their business differences and settle the accounts between them.  The mediation was

3  unsuccessful, and Sona ultimately filed suit against Hagop in state court.  In November 2010,

4  Sona cancelled her insurance policy with Philadelphia Indemnity and received a portion of her

5  premium in return.  She ultimately submitted a claim to Philadelphia Indemnity in March 2011

6  via her then-attorney, Barry Cohen, alleging in that claim that Hagop had stolen the boats from

7  her and that the theft was a compensable event covered under the insurance contract.[10]  During

8  the approximately eight months between when the alleged theft occurred and when the matter

9  was tendered to the insurance company, Sona never filed a complaint with police claiming to be

10  the victim of a theft of any kind.[11]

11    Ultimately, Philadelphia Indemnity retained outside counsel, and after investigating the

12  matter, denied Sona's claim in March 2013.  Among the reasons Philadelphia Indemnity gave for

13  refusing coverage were the following:  (1) it appeared no theft had occurred, and that whatever

---

[10]  At trial, Sona testified that she advised Ms. Barajas, who worked for a local insurance brokerage, to submit a claim in connection with Hagop's purported theft to Philadelphia Indemnity in August 2010.  The court does not find Sona's testimony in this regard to be credible. Barajas' persuasively testified in direct contradiction to Sona's version of these events, noting that Sona never told her to submit a claim but rather simply told her that there was a legal dispute about the business and to reduce the coverage.  Further, Sona's former attorney Barry Cohen, who drafted the original claim tender letter to Philadelphia Indemnity in March 2011, testified that he was not aware of the claim having been tendered at any point prior to his letter. Obviously, had the claim been tendered and remained pending without response for seven months, this likely would have been noted in attorney Cohen's claim tender letter.

[11]  Contrary to the misconceptions of plaintiff's counsel, the point of Sona's failure to call the police is not that it was required by the insurance policy in order for there to be coverage. Whether there was a reporting requirement in the policy is not before the court, because defendant has not raised plaintiff's failure to comply with any such policy requirement as a defense to plaintiff's breach of contract claim.  Rather, Sona's failure to call the police is evidence suggesting all parties to this family dispute, including Sona herself, understood that whatever occurred here was not a theft.  This is also why evidence of Sona reporting the alleged theft to the DMV is irrelevant.  Whether the DMV actually had potential authority under the law to investigate the alleged theft of boats is immaterial.  Even were that to be the case, Sona's trial testimony that she believed the DMV was the proper authority to report such a crime to is simply not credible.  Sona—a well-educated, articulate business woman and college professor—must know what is obvious to any reasonable person:  if, as she claims occurred, someone physically assaults you, threatens you, and steals $800,000 in property from you, you call 911, not the DMV. In suggesting otherwise, Sona does serious damage to her credibility as a witness.

had happened between Hagop and Sona was the result of an intra-family legal dispute; and (2) it appeared Hagop was either an employee or an authorized representative of Pacific Marine Center, and any losses due to his wrongdoing were therefore excluded under the policy.  (Parties' Joint Ex. JX-33.)

CONCLUSIONS OF LAW

At the outset, it is important to understand what is alleged by plaintiff in the complaint filed in this action.  The only insurance claim plaintiff ever tendered to the defendant was one arising from an alleged theft.  Moreover, an alleged theft is the only basis for the claim against the defendant insurance company that plaintiff has presented in this civil action.  In the original complaint, plaintiff specifically alleged: defendant insured the business against "loss by theft;" "inventory and other items at Pacific Marine's place of business were stolen" in late July 2010; and that plaintiff had notified defendant "of the theft loss" and defendant refused to pay despite the coverage provided by the insurance policy.  (Doc. No. 1 at 10.)  Moreover, plaintiff's complaint specifically alleged that the defendant's coverage denial "for the theft loss and failure to reimburse plaintiffs for the theft loss" was what constituted the breach of contract.  (*Id.*)

It is undisputed that the policy at issue provides coverage beyond merely that for theft loss. (Parties' Joint Ex. JX-1.)  Indeed, the policy actually covers "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  (*Id.*)  This is generally known as an "all-risk" policy, which covers losses stemming from theft, property damage, and other sources.  Direct physical loss under an all-risk policy generally may include losses due to either theft or conversion.  *See Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.,* 866 F.2d 71, 78 (3d Cir. 1989) (interpreting Pennsylvania law and holding conversion is covered under an all-risk policy); *EOTT Energy Corp. v. Storebrand Int'l Ins. Co.*, 45 Cal. App. 4th 565, 569 (1996) (theft).  However, plaintiff here never moved to amend the complaint in order to attempt to expand its theory of liability, and the operative complaint simply does not allege that defendant breached the insurance contract because it failed to cover Hagop's unauthorized conversion of the property.  Therefore, in light of the allegations of the complaint and the theory of liability consistently pursued by plaintiff in this

11

1    litigation all the way through trial, plaintiff proving a theft occurred is necessary for it to prevail

2    here. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–94 (9th Cir. 2000) (holding

3    plaintiff could not proceed on theories of liability not raised in the complaint); *see also Scantlin v.*

4    *General Elec. Co.*, Case No EDCV 10-00333 VAP(OPx), 2014 WL 12579821, at *4–8 (C.D. Cal.

5    Dec. 22, 2014) (no new theory of case allowed on the eve of trial without showing manifest

6    injustice); *Merchant Transaction Sys., Inc. v. Nelcela, Inc.*, No. CV 02-1954-PHX-MHM, 2009

7    WL 723001, at *18 (D. Ariz. Mar. 18, 2009) (concluding court need not consider new theories of

8    the case after party was provided full and fair opportunity to present their claim); *Giddings v.*

9    *Vision House Prod., Inc.*, 584 F. Supp. 2d 1222, 1226 (D. Ariz. 2008) ("Where a plaintiff sets

10   forth one theory in the complaint and does not move to amend until summary judgment

11   proceedings, it is barred from proceeding on a new theory.") (citing *Coleman*, 232 F.3d at 1292);

12   *Lloyd v. Ashcroft*, 208 F. Supp. 2d 8, 11 (D.D.C. 2002) ("A plaintiff cannot change the theory of

13   his case in his post-trial motion in order to survive a Rule 50 motion for judgment as a matter of

14   law. He is bound by what he pled and attempted to prove at trial").

15       With this in mind, below the court will address the law applicable to the consideration of

16   plaintiff's claim.

17       *1.    Breach of Contract*

18       In order to demonstrate a breach of contract under California law, a party must show: (1)

19   the existence of a contract; (2) plaintiff's performance under the contract or excuse for

20   nonperformance; (3) defendant's breach; and (4) resulting damages to the plaintiff. *Oasis West*

21   *Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). California courts have held "all risk"

22   policies generally cover losses due to theft. *EOTT Energy Corp.*, 45 Cal. App. 4th at 569.

23       Theft is defined statutorily in California as a criminal act, with an accompanying *mens*

24   *rea*.[12] Cal. Penal Code § 484; *see also People v. Lawson*, 215 Cal. App. 4th 108, 113–14 (2013)

---

[12]  Plaintiff has refused to abandon its argument that conversion is the same as theft, and revisited this theme again in its trial brief. (Doc. No. 160 at 19–20) (arguing that because there is no tort action for theft, the court should adopt a definition of conversion as analogous because it is "a pretty good 'street' definition of 'theft'"). Further, plaintiff asserts theft should be defined for purposes of this action as either analogous to conversion or as "taking someone else's property without their consent," a definition plaintiff proposes without citation to any authority. (*Id.* at

1    (theft by larceny requires intent to steal the property); *People v. Zangari*, 89 Cal. App. 4th 1436,

2    1441–42 (2001) (*mens rea* of theft requires "the intent to permanently deprive a person of

3    property"); *Ferraro v. Pacific Fin. Corp.*, 8 Cal. App. 3d 339, 348 n.3 (1970) (Penal Code § 484

4    requires "intent to permanently deprive the owner of its possession").  The intent which underlies

5    a theft must be felonious, and because the crime of theft requires the "intent to steal," "California

6    courts for over 150 years have recognized" that "a good faith belief that the specific property

7    taken is one's own" is a defense to a charge of theft.  *People v. Tufunga*, 21 Cal. 4th 935, 938–39

8    (1999).  This principle is also called having a "claim of right."  *Id.*; *see also People v. Anderson*,

9    235 Cal. App. 4th 93, 99 (2015) ("The claim-of-right defense provides that a defendant's good

10   faith belief, even if mistakenly held, that he has a right or claim to property he takes from another

11   negates the felonious intent necessary for conviction of theft or robbery.")

12       In the insurance context, California courts have explained that words such as "theft,"

13   "stolen," "robbery," and "pilferage," are words "that are well understood, and . . . are used in

14   insurance policies in their common and ordinary meaning."  *Barnett v. State Farm General Ins.*

15   *Co.*, 200 Cal. App. 4th 536, 543 (2011) (quoting *Granger v. New Jersey Ins. Co.*, 108 Cal. App.

16   290, 294 (1930)).  Particularly, in order for an alleged theft to be covered under an insurance

17   policy in California, a felonious taking of property is required.  *Barnett*, 200 Cal. App. 4th at 543.

18   As the California Court of Appeal explained:

19           The requirement in the words "theft" and "stolen" of a felonious
             taking is critical because it is not enough to commit a "trespass"
20           against another's right of possession, rather there must exist a
             criminal "intent to steal," or "animus furandi," that consists of "the
21           intent, without a good faith claim of right, to permanently deprive
             the owner of possession."

22

23   ───────────────────────────────────────────────

24   19.) Plaintiff argues the court must adopt its interpretation of the word "theft," because California
     law requires the contract to be interpreted in favor of the insured.  (*Id.*)  Again, plaintiff simply
     fails to understand its case.  This is not primarily a tort action, but rather one for breach of an
25   insurance contract.  Protesting that there is no tort action for theft and that one must instead allege
     conversion is irrelevant here.  This court has never held that proof of conversion in another suit
26   (i.e. Sona's personal action against her brother Hagop in state court) *precludes* a determination of
     theft in this suit.  It has simply held that the actions do not present the same claim.  What is placed
27   at issue by plaintiff's claim here is what "theft" means in terms of this insurance contract as a
     matter of California law.

28

1  *Id.* (quoting *People v. Davis*, 19 Cal. 4th 301, 305 (1998)).  Analyzing the issue further, the

2  California Court of Appeals noted:

3        [The act in question] cannot constitute a "theft" because it was
       neither criminal nor . . . was there any evidence of an intent to
4       deprive Barnett of his property permanently and in a criminal
       manner, rather than by due process of law.  The initial taking was
5       not a criminal act because a claim of right dispels the criminal
       character necessary to constitute a theft within the common
6       meaning of the word. . . .

7        Stated simply, a claim of right to take disputed property negates the
       criminal intent necessary for theft.  Section 511 of the Penal Code
8       codifies this principle, providing that a claim of right vitiates
       criminal charges where the property was appropriated openly and
9       avowedly, and under a claim of title preferred in good faith, even
       though such claim is untenable.  **Thus, in the insurance context,**
10      **the fact that the alleged wrongdoer acted under a bona fide**
       **claim of title removes the criminal character from his or her**
11      **act, and, therefore, takes the loss out of the coverage of a policy**
       **covering loss via such offenses.**

12

13  *Id.* at 544–45 (internal citations and quotations omitted) (emphasis added).  Because what is at

14  issue is a claim of right, it is axiomatic the claim "may later be undercut or proven inferior or

15  unavailing once the matter is litigated, but this does not change the fact the initial taking is not

16  criminal under California law."  *Id.* at 545.  "[T]he third party's intent matters," and a "claim of

17  right at the time of the taking . . . dispels the criminal character required to constitute a theft."  *Id.*

18  at 546; *see also Stevens v. Zurich Am. Ins. Co.*, Case No. 3:14-cv-02043 SC, 2015 WL 5258763,

19  at *3 (N.D. Cal. Sept. 9, 2015) ("To the extent that Stevens was deprived of his property, it was

20  not done 'in a criminal manner.'"); *Sager v. USAA Cas. Ins. Co.*, SA CV 12-1015 FMO (MLGx),

21  2014 WL 12594137, at *5-6 (C.D. Cal. Mar. 31, 2014) (granting summary judgment in favor of

22  the defendant insurance company on plaintiff's breach of insurance contract claim which was

23  premised on the allegation that his former girlfriend had refused to return his property he had left

24  at the condominium they had shared and that a theft had therefore occurred which was covered by

25  his insurance policy).  As indicated above and perhaps most importantly here, an alleged thief

26  who acts under a good faith claim of right need not establish that their subjective belief was

27  reasonable.  *People v. Romo*, 220 Cal. App. 3d 514, 518 (1990); *see also Heatley v. Tilton*, No.

28  08cv0580-L(WMc), 2009 WL 943786, at *10 (E.D. Cal. Apr. 7, 2009); *Page v. Runnels*, No. C

1   04-1009 SI (pr), 2006 WL 2925690, at *3 (N.D. Cal. Oct. 12, 2006).

2          A claim of right requires a "*good faith* belief that the specific property taken is one's

3   own." *Tufunga*, 21 Cal. 4th at 939 (emphasis added).  Whether such a good faith belief exists is

4   determined based upon the circumstances presented.  However, "[b]ad faith means simply that the

5   action or tactic is being pursued for an improper motive."  *Gemini Aluminum Corp. v. California*

6   *Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1263 (2002).  Bad faith can be shown by

7   demonstrating a party acted for improper purposes such as causing delay or harassment.  *Id.*   A

8   complete lack of merit in a legal proceeding *may* be evidence of bad faith, but does not

9   conclusively determine it and it is not mandatory for the court to find that it does.  *Summers v.*

10  *Cathedral City*, 225 Cal. App. 3d 1047, 1073 (1990).

11          2.      *Exclusions*

12          In California, exclusionary clauses in insurance contracts are strictly construed against the

13  insurer and in favor of the insured.  *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 471

14  (2004).  "Any ambiguity or uncertainty in an insurance policy is to be resolved against the

15  insurer."  *Crane v. State Farm Fire & Cas. Co.*, 5 Cal. 3d 112, 115 (1971).  The insurer bears the

16  burden of proof to demonstrate that a claim falls within a policy's exclusionary provisions.  *North*

17  *Am. Bldg. Maint., Inc. v. Fireman's Fund Ins. Co.*, 137 Cal. App. 4th 627, 642 (2006) (citations

18  omitted).  "[S]trict construction does not mean strained construction; under the guise of strict

19  construction, [a court] may not rewrite a policy to bind the insurer to a risk that it did not

20  contemplate and for which it has not been paid."  *National Union Fire Ins. Co. v. Lynette C.*, 228

21  Cal. App. 3d 1073, 1077 (1991).  Where the terms of an insurance policy are not defined, the

22  court is "to look first to the language of the contract in order to ascertain its plain meaning or the

23  meaning a layperson would ordinarily attach to it."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1,

24  18–19 (1995).

25          An insurance claim is properly excluded under an entrustment exclusion if the loss was

26  caused by the person to whom the property was entrusted.  *Su v. New Century Servs., Inc.*, No.

27  CV 12–03894 DDP (SSx), 2013 WL 5775160, at *3–4 (C.D. Cal. Oct. 25, 2013); *see also Atlas*

28  *Assurance Co. v. McCombs Corp.*, 146 Cal. App. 3d 135, 144 (1983).  Courts have found that

terms such as "entrustment" may or may not be ambiguous depending on the language of the insurance contract. *Compare Atlas Assurance Co.*, 146 Cal. App. 3d at 144 (finding no ambiguity) *with Intransit, Inc. v. Travelers Prop. & Cas. Co. of Am.*, Case No. No. 1:11–CV–03146–CL, 2012 WL 5208170, at *10 (D. Ore. Oct. 22, 2012) (finding the entrustment provision of a policy to be ambiguous).

An insurance claim is properly excluded under an authorized representative exclusion if the taking of property was done by an authorized representative. *See Stanford Univ. Hosp. v. Federal Ins. Co.*, 174 F.3d 1077, 1084–85 (9th Cir. 1999); *Southern California Counseling Center v. Great Am. Ins. Co*., 162 F. Supp. 3d 1045, 1050–53 (C.D. Cal. 2014), *aff'd* 667 Fed. App'x 623 (9th Cir. 2016). An authorized representative exclusion "covers those who by authorization of the insured are given access to and permitted to handle the insured's funds" or other property. *Stanford Univ. Hosp.*, 174 F.3d at 1085. Such a provision "excludes coverage for misappropriation of funds by those individual or entities authorized by the insured to have access to the funds—in essence, those whom the insured empowers to act on its behalf." *Id.*

Barring language to the contrary included in the agreement, exclusions such as an authorized representative or entrustment exclusion still apply "even if the loss occurs after" the authorization or entrustment has terminated, "so long as there is a 'causal connection between the act of entrustment and the resulting loss.'" *Su*, 2013 WL 5775160 at *4; *see also Bita Trading, Inc. v. Nationwide Mut. Ins. Co.,* No. 13cv1548 JM (WVG), 2015 WL 433557, at *7 (S.D. Cal. Feb. 3, 2015) (finding entrustment exclusion barred claim for property damage caused by lessee despite termination of tenancy); *Plaza 61 v. North River Ins. Co.*, 446 F. Supp. 1168, 1171 (M.D. Pa. 1978) ("The mere fact that Majo had been told to vacate the site does not change this taking into a theft. Regardless of the status of the parties' legal relations on December 5, 1973, Majo had come into possession of the disputed goods as a result of its work under the construction contract and was carrying them off under a claim of right arising from that contract. This is a risk against which Defendant did not insure.").

/////

/////

1

**ANALYSIS**

2

    1.    *No Theft Occurred*

3

    "[T]he insured has the initial burden of showing that 'the occurrence forming the basis of

4

its claim is within the basic scope of insurance coverage.'" *Estes v. State Farm Mut. Auto. Ins.*

5

*Co.*, Civil No. 15-cv-0757-JAH (WVG), 2016 WL 4595949, at *3 (S.D. Cal. May 18, 2016)

6

(quoting *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998). Based upon the

7

evidence presented at trial the court concludes that plaintiff did not meet its burden of

8

demonstrating that a theft occurred. In order to demonstrate a theft occurred, plaintiff bore the

9

burden of proving Hagop had the necessary *mens rea* to commit a theft. Based on the evidence

10

presented, plaintiff simply failed to meet this burden.

11

    The evidence presented at trial tends to establish Hagop and Sona entered into a "family

12

understanding," concocted by the family attorney, to transfer Hagop's business assets to a

13

dormant corporation in order to avoid a potential IRS levy on those assets. This plan was

14

specifically designed by its architect to help ensure Hagop's business would continue to be a

15

functioning entity following his release from prison. The testimony from Hagop's attorney,

16

which the court found to be credible, was that Hagop had a subjective expectation the business

17

would ultimately be returned to him, following the service of his prison term. Hagop too testified

18

at trial to this understanding and, at least on this point, the court found his testimony to be

19

credible. Hagop also believed Pacific Marine Center was ultimately his business, regardless of

20

the current corporate structure of that business. This subjective belief alone, which the court finds

21

to be credible, would likely be sufficient to require that judgment be entered in favor of

22

defendant. *See Romo*, 220 Cal. App. 3d at 518 ("An unreasonable belief that [an alleged thief]

23

had a legal right to take another's property will suffice so long as he can establish his claim was

24

made in good faith."). Nevertheless, there was additional evidence introduced at trial that

25

convinces this court no theft occurred here.

26

    The evidence at trial established that Hagop acted toward the property in question as one

27

would act toward property to which they believed they had a rightful claim. As noted above,

28

shortly after removing the boats from the neighboring property, he sent his sister a letter through

17

counsel stating that he had repossessed the boats. Hagop also provided an inventory of the boats and other items removed from the neighboring premises in an attachment to the letter to his sister. Further, Hagop contacted the insurance agent, Ms. Barajas, to discuss the insurance coverage on the building, and advised her he had taken over the business. He also contacted the DMV himself, seeking to have titles re-issued for any boats he had taken possession of for which Sona had retained possession of the titles. All of these actions are consistent with a conclusion that Hagop had a good faith claim of right to the business assets of Pacific Marine Center.[13]

Besides Hagop's belief and attorney Nast's persuasive testimony that the transaction was carried out pursuant to a "family understanding" that the business would be eventually be returned to Hagop, the parties to this agreement did not act as one would toward a normal, arms-length business transaction. This further supports the court's decision that no theft occurred here. First, Sona executed the final purchase agreement for the business assets on behalf of Hagop using his power of attorney and for Pacific Marine Center as its principal. Such obvious self-dealing is inherently suspicious, but not nearly so odd as Sona's subsequent execution of a promissory note reconciling various undocumented "loans" she made to her brother, again using his power of attorney to execute that note on his behalf, and secured by his interest in the original Pacific Marine Center note. Additionally, Pacific Marine Center continued to pay Hagop throughout his time in prison and following his release from custody and return to the business. These payments were on an irregular and varied basis, and much more closely match the regular profits from each sale that an owner of a closely-held corporation could expect to receive than they do payments on a loan as suggested by Sona. Though the agreement between the parties called only for approximately $7,000 to be paid to Hagop per month, the funds provided him were frequently many times that each month.

The transfer of significant funds to Hagop in this haphazard and splintered manner strongly suggests that Hagop, in fact, continued to run the business as though it were his own. Though the only purpose of selling the assets to a corporate entity pursuant to the "family

---

[13] The court also notes that Pacific Marine Center remains an active business many years later, still under the management of Hagop, despite a conversion judgment in favor of Sona.

1    understanding" was to limit the likelihood and impact of a levy from the IRS on the business, no

2    evidence was introduced that the IRS ever did levy on Hagop's assets in Pacific Marine Center.

3    In the absence of such a levy, Pacific Marine Center could continue to pay Hagop all the normal

4    profits he would have earned from running his business.   It appears the plaintiff here did exactly

5    that.   Evidence was presented at trial that Hagop continued to work for Pacific Marine Center

6    after his release from prison up until his business relationship with Sona soured completely.   The

7    court finds this evidence of Hagop's continued involvement in the operation of the business to be

8    credible.   All of this reinforces the conclusion that there was at least a good faith claim on

9    Hagop's part that Pacific Marine Center was his business.

10         Additionally, in the aftermath Sona herself did not act as one would be expected to act

11    toward a theft.   Indeed, she treated it as though Hagop had a good faith claim of right to the

12    property in question.   Rather than calling the police after her brother allegedly assaulted her and

13    stole the better part of $1 million dollars in assets from her, she renegotiated her insurance

14    coverage, filed a lawsuit against her brother, and entered into settlement negotiations in relation

15    to the allegedly stolen business assets.   Sona did not advise the insurance company any theft had

16    occurred until approximately eight months had passed, at which point efforts to settle the dispute

17    between her and her brother had begun to falter.   Though Sona testified at trial that she reported

18    the theft to the DMV, the court infers that the report to DMV was more likely done to consternate

19    her brother and escalate the conflict between them rather than as an actual effort to seek an

20    investigation of a theft, which the DMV at any rate apparently never conducted.[14]

21         In sum, the court concludes that plaintiff has not met its burden to prove a theft occurred.

22    Plaintiff did not introduce sufficient evidence at trial to demonstrate Hagop lacked a good faith

23    claim of right to the possession of the property allegedly stolen.   Lacking proof of Hagop's

24    felonious intent, this loss of property is not covered as a theft under the insurance policy.

25    Therefore, defendant did not breach its insurance contract with plaintiff by failing to pay

26

---

27    [14]   It can also reasonably be inferred from the lack of evidence of a DMV investigation that DMV
      authorities also did not view what had allegedly occurred as a theft but rather as a dispute
28    between sister and brother who were involved in business with one another.

1    plaintiff's claim for the allegedly stolen property.

2         2.    *The Exclusions Would Bar Coverage Even if a Theft Had Occurred*

3         Additionally, the court finds in the alternative that, even if a theft had occurred, coverage

4    would be barred by the exclusions contained in the parties' insurance contract.  Concerning these

5    exclusions, the contract states:

6              We will not pay for loss or damage caused directly or indirectly by
               any of the following.  Such loss or damage is excluded regardless of
7              any other cause or event that contributes concurrently or in any
               sequence to the loss.
8

9              . . .

10             h.    Dishonest or criminal act by you, any of your partners,
                     employees (including leased employees), directors, trustees,
11                   **authorized representatives** or **anyone to whom you
                     entrust the property for any purpose**.

12   (Parties' Joint Ex. JX-1 at 66–68) (emphasis added).[15]

13        The parties dispute whether Hagop was either an authorized representative of plaintiff, or

14   whether he was entrusted with Pacific Marine Center's boat inventory.  If either is true, coverage

15   was appropriately denied under the above exclusion.  The insurance contract does not specifically

16   define either the phrase "authorized representatives" or the word "entrust."  Plaintiff argues the

17   term "entrust" means "to deliver to (another) something in trust."  (Doc. No. 160 at 28–29) (citing

18   *Freedman v. Queen Ins. Co.*, 56 Cal. 2d 454, 457–58 (1961)).  Though plaintiff's trial brief

19   spends many pages seeking to distinguish the court decisions upon which defendant relies,

20   plaintiff has proffered no definition for the term "authorized representatives" as it is used in the

21   policy.  (Doc. No. 160 at 30–35.)  While not providing a definition of the term "entrust,"

22   defendant argues an authorized representative is one "who has been given access to and permitted

23   to handle the insured's funds, and generally is 'in essence, those whom the insured empower to

24   act on its behalf.'"  (Doc. No. 158 at 7–8 (citing *Stanford Univ. Hosp. v. Federal Ins. Co.*, 174

25   F.3d 1077, 1085 (9th Cir. 1999)).)  Predominantly, plaintiff's argument here is that, regardless of

26   whether Hagop was ever entrusted with the property or was an authorized representative of the

27

28   ───────────────
     [15]  These page numbers reflect the court's count of the pages contained within this voluminous
     exhibit which were not numbered.

                                            20

1    company, he was not so entrusted or authorized at the time of the alleged theft.  (Doc. No. 160 at

2    28–35.)  Plaintiff's argument is unpersuasive.

3        The court finds neither of these terms ambiguous.  Similar to plaintiff's construction, to

4    "entrust" property to another means to "deliver something to (another)."  *Webster's Third New*

5    *International Dictionary* (Philip Babcock Gove ed. 2002), at 759 (hereinafter "*Webster's*").  To

6    "authorize" is "to endorse, empower, justify, or permit by or as if by some recognized or proper

7    authority."  *Webster's* at 146–47.  A representative, meanwhile, is defined as "one that represents

8    another as agent, deputy, substitute, or delegate usually being invested with the authority of the

9    principal," or "one that represents a business organization: salesman."  *Webster's* at 1926–27.

10   Therefore, "anyone to whom you entrust the property for any purpose" means anyone to whom

11   property is delivered for any reason.  An "authorized representative" is simply one who has been

12   permitted to represent a business.

13       Under California law, the insurer bears the burden of proving that an exclusion under the

14   policy applies.  *Aydin Corp. v. First State Insurance Co*., 18 Cal. 4th 1183, 1189-90 (1998);

15   *Mable Bridge Funding Group Inc. v. Euler Hermes American Credit Indemnity Co.,* Case No.

16   5:12-cv-02729, 2016 WL 7034050, at *7 (N.D. Cal. Dec. 2, 2016) (citing *Gray v. Zurich Ins. Co*.,

17   65 Cal.2d 263, 274 (1966)).  It is clear in this case that defendant has met that burden by

18   demonstrating that Hagop was both an authorized representative of plaintiff and was entrusted

19   with its property.  The evidence presented at trial established that Hagop had access to both

20   properties on which plaintiff's business was located, including keys to the buildings.  It also

21   demonstrated that Hagop conducted business on behalf of Pacific Marine Center, including

22   attending auctions to purchase boats, communicating with customers concerning boat sales,

23   selling boats at the Pacific Marine Center location, signing checks on behalf of Pacific Marine

24   Center, and apparently receiving payments from the business's profits on a regular basis.

25       Sona's contrary explanations regarding this conduct ring hollow to the court.  Her

26   testimony that her brother, Hagop, was never authorized to conduct business on behalf of Pacific

27   Marine Center, stole checks, broke into her office, changed the locks without her permission, and

28   was actually completely uninvolved in the business of Pacific Marine Center are simply not

1   credible.  Sona herself testified previously at Hagop's deportation hearing in April 2009 that her

2   brother was the only one who could manage the Pacific Marine Center business.  She also

3   repeatedly filled out paperwork for her brother's supervising probation officer depicting Hagop as

4   working on behalf of Pacific Marine Center.  These various contradicting testimony and

5   statements undercut Sona's credibility as a witness.  Further, Sona's posting of a notice at the

6   business that employees hired by Hagop did not work for Pacific Marine Center would be a

7   surprising act if Hagop had actually had no involvement in the business between November 2007

8   and July 2010, since one would not typically need to advise their employees that an outsider

9   completely uninvolved in the operations of a business is, in fact, not involved in the operations of

10   that business.

11         Of course, the court does not find Hagop's trial testimony entirely credible either.  For

12   instance, the court does not believe Hagop's testimony that he received no money in exchange for

13   his work selling boats on behalf of Pacific Marine Center.  Rather, as the court has already

14   indicated, the payment records appear to correspond to the regular withdrawals an owner might

15   take from the profits of his closed corporation generated through sales.  Serious doubts about the

16   veracity of both Hagop and Sona's testimony aside, it is clear to the court that Hagop had access

17   to the boat inventory in this case, was empowered to act and did act on behalf of Pacific Marine

18   Center, and represented the company in many of its dealings.  This leads directly to the inevitable

19   conclusion that Hagop was entrusted with the property, and was an authorized representative of

20   Pacific Marine Center.  As such, any alleged theft committed by him was, by the terms of the

21   insurance policy, excluded from coverage.  Therefore, there was no breach of the parties'

22   insurance contract by the defendant.

23         *3.      Breach of the Covenant of Good Faith and Fair Dealing*

24         As the court noted in its prior order denying the parties' cross motions for summary

25   judgment, any tort action for the breach of the covenant of good faith and fair dealing is

26   predicated upon a finding of a breach of contract.  (Doc. No. 134.)  An insurer may always

27   "simply deny the request and take its chance that the trier of fact in an action alleging bad faith

28   breach of the contractual duty to defend will agree that no defense was owed." *Eigner v.*

1 | *Worthington*, 57 Cal. App. 4th 188, 195–96 (1997); *see also Avery Dennison Corp. v. Allendale*
2 | *Mut. Ins. Co.*, 310 F.3d 1114, 1117 (9th Cir. 2002) ("Except perhaps in highly extraordinary
3 | circumstances, California does not permit recovery on a bad faith claim unless insurance benefits
4 | are due under the policy.").  Since the court has determined there was no breach of contract by
5 | defendant here, there is likewise no breach of the covenant of good faith and fair dealing.

6 | **CONCLUSION**

7 |       Given the above findings of fact and conclusions of law, the court determines the
8 | insurance contract at issue here was not breached and judgment must be entered in favor of the
9 | defendant.  This order constitutes the findings and conclusions required by Rule 52(a) of the
10 | Federal Rules of Civil Procedure.  The Clerk of Court is directed to enter judgment in favor of
11 | defendant on all of plaintiff's claims in accordance with Federal Rule of Civil Procedure 58(b)
12 | and to close this case.[16]

13 | IT IS SO ORDERED.

14 |       Dated:   **March 30, 2017**

15 | UNITED STATES DISTRICT JUDGE

---

[16] The parties are referred to the Federal Rules of Civil Procedure and the Federal Rules of Appellate Procedure with respect to the time in which to file any post-trial motions or notices of appeal.